UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

TIMOTHY D. DADE,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )       No.  2:12CV89 ACL
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
                Defendant.          )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Timothy D. Dade's

applications for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq.*, and for supplemental security income

(SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are

pending before the undersigned United States Magistrate Judge, with consent of

the parties, pursuant to 28 U.S.C. § 636(c).  For the reasons set forth below, the

Commissioner's decision is affirmed.

### I.  Procedural History

Plaintiff Timothy D. Dade applied for DIB and SSI on January 6, 2010,

claiming that he became disabled on April 1, 2007, because of back pain, left rib

pain, arm weakness, and high blood pressure.  (Tr. 143-50, 151-54, 207)  On

February 23, 2010, the Social Security Administration denied plaintiff's claims for

benefits.  (Tr. 87, 88-89, 90-93)  Upon plaintiff's request, a hearing was held

before an Administrative Law Judge (ALJ) on July 14, 2011, at which plaintiff and

a vocational expert testified.  (Tr. 38-79)  On October 28, 2011, the ALJ issued a

decision denying plaintiff's claims for benefits, finding plaintiff able to perform

work that exists in significant numbers in the national economy.  (Tr. 11-26)  On

November 8, 2012, upon review of additional evidence, the Appeals Council

denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-8)  The ALJ's

determination thus stands as the final decision of the Commissioner.  42 U.S.C. §

405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's

decision is not supported by substantial evidence on the record as a whole, arguing

that the additional evidence submitted to the Appeals Council relating to his mental

impairment shows that the ALJ's determination of plaintiff's residual functional

capacity (RFC) should have included additional mental limitations.  Plaintiff also

contends that the ALJ erred in his credibility determination inasmuch as he relied

only on a lack of objective medical evidence to discredit plaintiff's subjective

complaints.  Finally, plaintiff argues that the ALJ failed to consider the extent to

which side effects from his medications affect his ability to work.  Plaintiff

requests that the matter be reversed and remanded to the Commissioner for an award of benefits or for further proceedings.

Because the ALJ committed no legal error and substantial evidence on the record as a whole supports his decision, the Commissioner's final decision that plaintiff was not disabled is affirmed.

## II. Testimonial Evidence Before the ALJ

A.   <u>Plaintiff's Testimony</u>

At the administrative hearing on July 14, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty-two years of age.  Plaintiff completed the tenth grade and did not receive his GED.  Plaintiff has six children, all of majority age, and recently reunited with his estranged wife.  (Tr. 43-44)  He also had a son who was murdered in 2004.  (Tr. 435)  Plaintiff has had Medicaid assistance for about one year.  (Tr. 44)

Plaintiff's Work History Report shows plaintiff to have worked as a city refuse collector from 1996 to 1997.  From 1997 to 2000, plaintiff worked at LaGrange Foundry trimming castings.  From 2001 to 2004, plaintiff worked at Dura Automotive as a machine operator and assembler.  From 2004 to 2005, plaintiff worked at Display Center as a machine operator and shipper.  From 2004 to 2007, plaintiff worked at Buckhorn Rubber as a machine operator.  (Tr. 216-21)

Plaintiff testified that his job ended at Buckhorn on April 8, 2007, when a drug test yielded a false positive result for cocaine, which was caused by his use of pain medication. Plaintiff testified that he has not looked for work since, because of his inability to walk. (Tr. 49, 69)

Plaintiff testified that he experiences constant pain in his back that radiates to his ribs, arms, and legs on a daily basis. Plaintiff testified that his back pain is aggravated with any activity, such as sweeping or lifting objects that weigh five to ten pounds, and that he therefore tries to move slowly with his activities. Plaintiff testified that he sits on a loveseat couch with pillows propped on the side and against his back to help the pain. (Tr. 52-54, 57-58) Plaintiff testified that the radiating pain to his legs causes a charlie-horse-like feeling in his feet, which becomes more aggravated with walking. Plaintiff testified that he exercises his legs while sitting to help with the pain. (Tr. 55-56) Plaintiff testified the radiating pain to his arms causes a charlie-horse-like feeling in his hands resulting in difficulty using his hands. Plaintiff testified that he tries to relax to help the arm pain. (Tr. 57) Plaintiff testified that his rib pain is a knife-like stabbing pain aggravated by twisting, bending, and picking up things. (Tr. 59-60)

Plaintiff testified that his current pain medications include Butrans patch and Hydrocodone. Plaintiff testified that his physician recommended physical therapy and MRI testing but that Medicaid would not cover the expenses. (Tr. 50-51)

Plaintiff testified that he also experiences headaches three or four times a day for which he takes Aleve and Hydrocodone.  (Tr. 61-62)

Plaintiff testified that he also has a separated right shoulder that did not heal properly.  Plaintiff testified that the condition causes pain and difficulty lifting things and created problems while he worked.  (Tr. 63)

Plaintiff testified that his pain causes him to become angry with people when they try to help him, because they do not understand what he is going through and he does not want to talk about his pain.  Plaintiff testified that he associates with only his children and girlfriend.  Plaintiff testified that the pain causes him to be forgetful and unable to concentrate.  Plaintiff testified that his pain causes difficulty with sleeping and that he usually sleeps on the couch while propped on his pillows.  Plaintiff testified that he was prescribed medication that made him sleep for two days and that another medication is to be prescribed with less of a sedative effect.  (Tr. 63-66)

As to his exertional abilities, plaintiff testified in response to counsel's question that, without his propped pillows, he can sit in one position for about ten minutes before experiencing increased pain requiring him to readjust his position. In response to the ALJ's question regarding how long plaintiff could sit in a chair, such as the hearing chair in which he was presently sitting, the plaintiff answered that he could do so for one to two hours.  Plaintiff testified that he can walk about

twenty feet before needing to stop to either sit or lean against an object. Plaintiff testified that he can stand in one place for five to ten minutes before needing to sit. Plaintiff testified that he is most uncomfortable while lying down. (Tr. 58-59, 67-68)

As to his daily activities, plaintiff testified that he sits and watches television or reads magazines. Plaintiff testified that his friends come to visit during which time he sits on the couch or on the porch to talk with them. Plaintiff testified that he tries to exercise as instructed by his doctor so that his body does not become stiff. (Tr. 68) Plaintiff testified that his children help with the housework and the chores, such as mowing the lawn, doing dishes, sweeping, and taking out the garbage. (Tr. 54)

B.      Testimony of Vocational Expert

Bob Hammond, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Hammond classified plaintiff's past work as a foundry laborer and machine operator as heavy and having an SVP level of 2. (Tr. 71)

The ALJ asked Mr. Hammond to assume an individual between just under fifty years of age to about fifty-five, with plaintiff's education and past work history. The ALJ further asked Mr. Hammond to assume that the person was able to perform light work, with lifting and carrying twenty pounds occasionally and ten

pounds frequently, standing and walking a total of six hours in an eight-hour workday, and sitting a total of six hours in an eight-hour workday. The ALJ asked Mr. Hammond to further assume the individual to be limited to no overhead lifting with the dominant right arm; occasional balancing, kneeling, crouching, crawling, stooping, and climbing ramps and stairs; no climbing of ropes, ladders, or scaffolds; and the need to change position for one or two minutes every hour. The ALJ asked Mr. Hammond to further assume that the individual was limited to simple, routine tasks. Mr. Hammond responded that such a person could perform light work such as an usher/ticket taker, of which 4,000 such jobs exist in the States of Missouri and Illinois and 136,000 nationally; laundry hand presser, of which 2,000 such jobs exist in Missouri and Illinois and 69,000 nationally; and lighting assembler, of which 5,000 such jobs exist in Missouri and Illinois and 200,000 nationally. (Tr. 71-72)

The ALJ then asked Mr. Hammond to assume the same individual but that he would be limited to four hours of standing and walking in an eight-hour workday. Mr. Hammond responded that such a person would be limited to sedentary work. With respect to a person limited to walking one block at a time, Mr. Hammond testified that the jobs to which he previously testified had no walking requirements but had standing requirements. (Tr. 73)

The ALJ then asked Mr. Hammond to assume an individual less than fifty

years of age who was limited to

> 10 pounds occasionally; standing and walking a total of two hours in eight; walking one block at a time; sit could be a total of six hours in eight; no overhead with the dominant right; of the posturals, balance, kneel, crouch, crawl, stoop, ramps and stairs would all be occasional; no ladders, ropes, or scaffolds; the person would need to change position for a minute or two every hour; and last, but not least, simple, routine tasks.

(Tr. 73-74) Mr. Hammond testified that such a person could perform sedentary work as a circuit board screener, of which 3,000 such jobs exist in Missouri and Illinois and 750,000 nationally; a semiconductor bonder, of which 3,000 such jobs exist in Missouri and Illinois and 47,000 nationally; and eyewear polisher, of which 2,000 such jobs exist in Missouri and Illinois and 96,000 nationally. (Tr. 74) Mr. Hammond testified that a person limited to staying at their work station for four hours at a time without being able to get up and walk around would not be precluded from performing such work. (Tr. 76-77)

Plaintiff's counsel then asked Mr. Hammond to assume an individual who experienced chronic headaches multiple times a week, each lasting three hours, such that his persistence and pace with a job would suffer to the extent that fifty percent of his job performance would be affected. Mr. Hammond testified that such a condition would eliminate all employment positions. Mr. Hammond also testified that an individual who had limited use of their hands such that they were not able to complete their assigned tasks would be precluded from all employment

positions.  In addition, Mr. Hammond testified that a person who was limited to no

contact with supervisors, the public, or coworkers would likewise be precluded

from all employment.  (Tr. 76-77)

Finally, plaintiff's counsel asked Mr. Hammond to assume an individual

who had no useful ability to function in their ability to carry out simple or complex

instructions, to which Mr. Hammond responded that all employment positions

would be eliminated.  (Tr. 77-78)

### III.  Medical Evidence Before the ALJ

On March 22, 2006, plaintiff visited Dr. Leslie A. McCoy with complaints

of chest tightness and pressure accompanied by shortness of breath.  Dr. McCoy

noted that plaintiff had been taking Vicodin as prescribed by his dentist, but that he

had run out of the medication.  Palpable pain in the chest was noted upon

examination.  Chest x-rays yielded negative results.  An EKG appeared negative

other than some left atrial abnormality.  Dr. McCoy excused plaintiff from work

for up to two days and prescribed Leva-Pak.  (Tr. 285-87)

Plaintiff visited Dr. Richard L. Baumann on April 10, 2006, who noted

plaintiff to complain of back and rib pain and soreness in his hands, fingers, and

arms.  Plaintiff associated his discomfort with his work.  Plaintiff reported that

only Vicodin helped his pain.  Plaintiff also reported experiencing some

depression, nervousness, dizziness, and headaches.  Dr. Baumann noted x-rays of

the shoulder taken in December 2005 to show evidence of a previous AC joint separation and dislocation, which appeared to be a chronic injury with calcifications as well as a little joint effusion. Dr. Baumann also noted a normal chest x-ray dated March 2006. X-rays of the thoracic spine taken in March 2006 showed a right-sided cervical rib, but was otherwise unremarkable. X-rays of the lumbar spine showed straightening of the lordotic curvature without evidence of fracture or subluxation. Some degenerative change around the bony parts was noted. Dr. Baumann reviewed treatment notes from other doctors, noting specifically that Dr. Evans' notes appeared consistent with some symptom magnification. Current physical examination showed plaintiff to have full motion of the neck and intact mobility of the upper extremities with full shoulder motion, good stability, and good strength. Plaintiff had full range of motion about the elbows with good stability and good strength in the biceps and triceps. Plaintiff's hand motion was noted to be complete. Dr. Baumann noted plaintiff to exhibit some symptom magnification with palpation and light skin touch. Dr. Baumann diagnosed plaintiff with muscular strain with symptom magnification and non-anatomic description of pain and discomfort. Dr. Baumann opined that there would likely not be any long term impairment and that there was no cause for further light duty restrictions. It was noted that no follow up was needed. (Tr. 277-78) Dr. Baumann reported to plaintiff's employer, Buckhorn Rubber, that

plaintiff could return to work with no limitations after having been treated for muscle strain sustained as a result of a December 2005 injury. (Tr. 279)

Between July 26, 2006, and August 20, 2007, plaintiff was admitted to and received treatment at the emergency room at Hannibal Regional Hospital for the conditions of sinusitis, bronchitis, pharyngitis, pneumonitis, and kidney infection. (Tr. 293-319)

On July 27, 2007, plaintiff was referred to physical therapy for musculoskeletal strain of the lumbar spine, thoracic spine, and cervical rib. (Tr. 322) Plaintiff reported the onset to have occurred with an injury in December 2005, but that the insidious nature of the pain had recently worsened. Plaintiff reported the pain to radiate to his knee and to worsen with lifting, pushing and pulling, and staying in one position for ten to twenty minutes. Plaintiff demonstrated limited range of motion about the lumbosacral spine, and tenderness was noted to palpation along the thoracic spine. Plaintiff was noted to have stiff gross motor movements. Deep tendon reflexes were diminished on the left. Straight leg raising elicited pain on the left and hamstring tightness on the right. A plan was put in place for rehabilitative therapy and a home exercise program. (Tr. 323-27)

Between July 30 and August 10, 2007, plaintiff participated in physical therapy on six additional occasions, with plaintiff's pain noted to decrease with use

of stronger pain medication, but to increase with rest. Plaintiff was discharged from therapy on August 24, 2007, with instruction to continue his home exercise program. Plaintiff's range of motion showed no change upon discharge. (Tr. 328-45)

Plaintiff visited the clinic at Blessing Hospital on February 4, 2008, with complaints of pain in his back, ribs, and right leg and occasional pain in his right arm. Plaintiff also reported having occasional weakness and numbness in his leg as well as occasional swelling and slight weakness in his arm. Plaintiff reported taking only Aleve and Tylenol for pain. Examination of the extremities showed no edema. Jill Miller, APN/CNP, noted tenderness to palpation along the entire spine with pain upon range of motion. Straight leg raising was positive bilaterally. Pain was noted about the left rib area. Strength was noted to be equal in the lower extremities with slightly decreased strength noted in the right arm. Nurse Miller diagnosed plaintiff with back pain and hypertension. Medication was prescribed for hypertension. Lortab (Hydrocodone) was also prescribed. Plaintiff was advised that no further action could be taken with regard to the back pain until all previous medical records had been reviewed. (Tr. 357-59)

Plaintiff returned to Nurse Miller on April 28, 2008, and reported worsening pain. Plaintiff reported taking Lortab more frequently than prescribed and that he also took Flexeril. Examination showed tenderness along the entire spine and

along the left lateral rib area.  Flexion, extension, and rotation increased plaintiff's

pain.  Straight leg raising was positive on the left and negative on the right.  Some

weakness was noted with foot pushes on the left.  Plaintiff was diagnosed with

back pain, rib pain, and hypertension.  Nurse Miller instructed plaintiff to continue

with Flexeril and Lortab and advised that no stronger medication would be

prescribed until plaintiff's pain was further assessed.  Naprosyn (Naproxen) was

also prescribed.  Nurse Miller noted that plaintiff needed an MRI of the lumbar and

thoracic spine.  (Tr. 360-61)

Plaintiff visited Nurse Miller on November 10, 2008, for a refill of his pain

medication.  Plaintiff continued to complain of pain and reported that his legs were

getting weaker.  Plaintiff also reported having occasional sharp pain in his rib area

with occasional needle-like sensations.  Plaintiff also reported a recent increase in

headaches.  Physical examination showed pain to palpation of the thoracic and

lumbar spine.  Straight leg raising was positive bilaterally.  Strength was noted to

be equal bilaterally in the lower extremities.  Nurse Miller noted Dr. Jeffrey M.

Wells to have written a prescription for Lortab, and plaintiff was instructed to

return in four months for a refill.  (Tr. 362-63)

Plaintiff underwent an independent medical examination on February 18,

2009, for complaints of pain in his back and ribs related to his work injury.

Plaintiff reported to Dr. Dwight Woiteshek that his pain began in December 2005

and continued through the termination of his job in late 2007. Plaintiff reported currently having problems lifting, pushing, pulling, standing, twisting, kneeling, squatting, climbing, reaching, bending, carrying, walking, and sitting. Plaintiff reported that he took Hydrocodone to get through the day. Neurologic examination showed no gross motor or sensory deficits. Pain and tenderness was noted about the lumbar spine with muscle spasm and guarding. Plaintiff had limited range of motion about the lumbar spine. Straight leg raising was positive bilaterally. No demonstrable weakness was noted about the lower extremities, and sensory examination was normal. Examination of the right shoulder showed crepitans with swelling and pain. Flexion and abduction of the right shoulder were decreased, internal and external rotation was slightly decreased, and adduction and extension were normal. Positive results were obtained on various diagnostic and clinical tests. Dr. Woiteshek reviewed past imaging results. Upon conclusion of the examination, Dr. Woiteshek diagnosed plaintiff with traumatic disc protrusion, reasonably confirmed, of the lumbar and thoracic spine. Dr. Woiteshek opined that plaintiff had not reached maximum medical improvement and needed further medical treatment. Dr. Woiteshek recommended that plaintiff undergo an MRI in order to clarify the nature of his impairment. (Tr. 348-52)

Plaintiff returned to Nurse Miller on April 17, 2009, and reported that the back pain was now constant. Plaintiff reported having difficulty doing daily tasks

because of the pain, and that his pain medication no longer helped – even with increased dosages. Plaintiff also reported having right shoulder pain. Plaintiff reported being unable to obtain an MRI, because of a lack of medical coverage. Physical examination showed tenderness along the lumbar and thoracic spine, the sacroiliac joint, and along the rib area. Straight leg raising was positive bilaterally. Plaintiff's prescription for Lortab was refilled, and plaintiff was instructed to return in four months for follow up. (Tr. 363-65)

Plaintiff visited Dr. Wells on December 9, 2009, and complained of headaches and left rib pain. Dr. Wells noted a CT scan to show hepatic cysts and post-infectious granulomatous disease. Plaintiff reported being a little down. Dr. Wells noted plaintiff's Lortab to have been refilled in November. Examination showed plaintiff to have full grip strength bilaterally and full strength in the upper and lower extremities bilaterally. No focal sensory or motor deficits were noted. Dr. Wells's diagnoses included hypertension, lumbago, and left costochondritis. Dr. Wells refilled plaintiff's prescription for Flexeril and additionally prescribed Naprosyn. Plaintiff was instructed to return in three months. (Tr. 366-67)

Plaintiff returned to Dr. Wells on July 19, 2010, and reported a recent onset of pain radiating down the lateral aspect of his left leg. Plaintiff reported that he could hardly walk because of the pain. Dr. Wells noted plaintiff's current medications to include Lortab, Meclizine, Naprosyn, and Flexeril. Plaintiff

reported that he had been denied Medicaid coverage and could not afford his medications. Physical examination showed deep tendon, Achilles, and patellar reflexes to be 2/4 bilaterally. Straight leg raising was negative. Dr. Wells diagnosed plaintiff with thoracic and lumbar spine pain and left lower extremity radicular pain. Plaintiff was administered an injection of Depo-Medrol. Plaintiff was instructed to apply heat and topical analgesics to the affected areas. (Tr. 411-12)

Plaintiff reported to Dr. Wells on August 25, 2010, that his pain was not getting better. Plaintiff brought in disability forms, but Dr. Wells indicated that he did not fill out such paperwork nor participated in it, but that he would forward his medical records to plaintiff's lawyer. Dr. Wells noted that plaintiff could not afford his medications, MRI imaging, physical therapy, or a specialist, stating that "[i]t is difficult to know what to treat [when] you do not have any imaging." Dr. Wells noted plaintiff's condition to be unchanged, and he increased the dosage of Lortab. (Tr. 413-14)

On October 27, 2010, plaintiff visited Kathy Pfaffe, a licensed clinical social worker at Community Health Center, for depression. Plaintiff reported being in a lot of pain because of the weather. Plaintiff reported having difficulty with sitting at home all day because of his disability. Plaintiff also discussed his son's death and his feelings regarding his son's killer being out of prison. Ms. Pfaffe

expressed concern about potential homicidal thoughts.  Ms. Pfaffe suggested that plaintiff attend a support group for persons who have lost loved ones to crime, but plaintiff declined stating that his family would tease him if he did so.  (Tr. 407)

Plaintiff returned to Ms. Pfaffe on November 3, 2010, and reported being in continued pain and that a recent cold caused him to cough, which aggravated his rib pain.  Plaintiff reported having difficulty with his inability to work and with thoughts of his son and his son's killer.  Plaintiff reported having had some suicidal thoughts, but that visits from family members help him.  Ms. Pfaffe suggested that plaintiff request an anti-depressant from his general physician.  (Tr. 401)

Plaintiff visited Dr. Wells on November 4, 2010, with complaints relating to upper respiratory infection.  Plaintiff also reported feelings of depression with no suicidal ideation, but with homicidal ideation.  Plaintiff reported that the person who killed his son had just been released from prison.  Dr. Wells prescribed Celexa (Citalopram) for plaintiff.  (Tr. 415-16)

Plaintiff visited Ms. Pfaffe on November 10, 2010, who noted plaintiff to have recently begun taking Celexa.  Plaintiff reported the medication to have helped his mood and that he was not letting things affect him as much.  Plaintiff also reported having obtained a recent settlement and that he was happy he could pay off some bills.  Plaintiff reported feeling more hopeful.  (Tr. 397)

In a treatment note dated November 24, 2010, Janet Hultgren, MSW/LCSW,

noted that one of plaintiff's sons was killed at twenty-two years of age (in 2004, Tr. 435) and that the man who killed him was recently released from prison (in 2010, Tr. 396). Plaintiff was noted to be experiencing rage. (Tr. 394, 396)

Plaintiff visited Ms. Hultgren on December 1, 2010, and reported that he was trying to deal with his son's death and the possibility that he might see the man who killed his son. On December 14, plaintiff reported to Ms. Hultgren that he was planning to see a specialist for his health conditions and hoped to get to the bottom of his health concerns. Plaintiff reported his medications to include Naproxen and Hydrocodone. Plaintiff continued to visit Ms. Hultgren through March 2, 2011, who noted during that time that plaintiff continually had a depressed mood, because of increasing pain, his inability to work, and being financially unable to provide for his family. (Tr. 392-95)

On February 25, 2011, plaintiff reported to Dr. Wells that he recently fell in his yard while bending over and could not get up for one and a half hours. Plaintiff reported his pain to currently be at a level seven on a scale of one to ten. Plaintiff also reported having numbness in his leg and that he experienced pain as if a nail was coming from his foot up to his left hip and back. Dr. Wells noted plaintiff to have obtained Medicaid four months prior. Physical examination was unremarkable. X-rays of the thoracic spine were normal, and x-rays of the lumbar spine showed degenerative disc disease. Dr. Wells diagnosed plaintiff with

thoracic and lumbar spine pain and administered an injection of Depo-Medrol. Plaintiff was prescribed Medrol Dosepak and was instructed to continue with his other medications.  (Tr. 417-18, 426)

Plaintiff returned to Dr. Wells on March 25, 2011, and reported his pain to be at a level eight.  Physical examination was unremarkable.  A chest x-ray showed no acute disease.  Dr. Wells noted that he continued to await word from the State as to whether the cost of an MRI would be covered.  Dr. Wells diagnosed plaintiff with degenerative disc disease of the lumbar spine and left-sided rib pain.  Dr. Wells prescribed Butrans patches and instructed plaintiff to use Lortab for breakthrough pain.  (Tr. 409, 419-20)

On March 30, 2011, Ms. Hultgren noted plaintiff's chronic pain to be causing a desperate spirit in that plaintiff reported wanting to give up since he was unable to rid himself of the pain.  (Tr. 391)

Plaintiff visited Angelique J. Cross, CNP, from Dr. Wells's office on April 6, 2011, who noted medication provided relief for only one week and that they continued to await approval from Medicaid for an MRI.  Plaintiff reported having muscle spasms, that he could hardly walk, and that he had to sit up to sleep because of leg pain.  Plaintiff reported his pain to worsen with walking and with activity.  Amitriptyline was added to plaintiff's medication therapy, and plaintiff was referred to physical therapy.  (Tr. 421)

On April 27, 2011, plaintiff reported to Ms. Hultgren that a recent pain patch prescribed by his doctor did not help, and that his medical card would not cover physical therapy or an MRI for which he had been referred. (Tr. 391)

Plaintiff returned to Dr. Wells on May 31, 2011, who noted that Medicaid did not approve an MRI and that plaintiff could not afford physical therapy. Plaintiff reported the Butrans patch to have worked for one week, but that the pain had returned. Plaintiff reported that the recent prescription for Amitriptyline made him sleep for two days. Physical examination was unremarkable. Neurological testing was 5/5 and no focal sensory or motor defects were identified. Dr. Wells increased plaintiff's dosage of the Butrans patch, refilled plaintiff's prescription for Lortab, and instructed plaintiff to take Amitriptyline only as needed. (Tr. 422-23)

On June 15, 2011, Ms. Hultgren completed a Mental Medical Source Statement (MSS) in which she opined that plaintiff had no limitations in his ability to understand and remember simple instructions and to make judgments on simple work-related decisions. Ms. Hultgren opined that plaintiff had mild limitations in his ability to understand and remember complex instructions and to make judgments on complex work-related decisions. Ms. Hultgren opined that plaintiff experienced extreme limitations in his ability to carry out simple and/or complex instructions. Finally, Ms. Hultgren opined that plaintiff experienced moderate to extreme limitations in his ability to interact appropriately with the public,

supervisors, and co-workers and in his ability to respond appropriately to usual work situations and to changes in a routine work setting. Ms. Hultgren reported that plaintiff's level of pain determined his ability to mobilize and have a conversation, and that his mood was affected by the intensity of his pain. Ms. Hultgren opined that plaintiff was unable to perform in a work setting because of depressive symptoms and that such disability began on April 1, 2007. (Tr. 429-31)

## IV. Records Submitted to the Appeals Council[1]

Plaintiff visited Ms. Hultgren on three occasions between June 22 and July 21, 2011, who noted plaintiff's continued pain and that plaintiff felt that he was not contributing to society, because of his inability to work despite his desire to work. (Tr. 449-53)

Plaintiff visited Dr. David E. Goldman, a psychiatrist, on September 20, 2011, for psychiatric evaluation. Dr. Goldman noted plaintiff to have only minimal eye contact during the evaluation and to have decreased amplitude of speech. Plaintiff was noted to be polite and cooperative but not spontaneously conversant. Dr. Goldman noted plaintiff to display a downcast and depressed demeanor throughout the interview and to become tearful when speaking about his

---

[1] In making its determination to deny review of the ALJ's decision, the Appeals Council considered additional evidence which was not before the ALJ. The Court must consider this additional evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

son.  Dr. Goldman noted plaintiff's medical history.  Mental status examination

showed plaintiff to be alert and oriented as to person, place, time, and situation.

Plaintiff's memory was tested and intact.  Plaintiff reported that he tries to stay

focused on things he wants to do, but that he loses focus when he engages in

activities that cause pain such as sweeping or lifting.  Plaintiff reported that he is

mostly sedentary because of his pain.  Plaintiff reported harboring discomfort with

the person who killed his son (determined by Dr. Goldman to be plaintiff's

nephew) and that he avoided the area where the man lived because of uncertainty

of his reaction if he saw him.  Plaintiff reported having had suicidal thoughts in the

past, but that he now had it "under control."  Dr. Goldman diagnosed plaintiff with

major depressive disorder, recurrent, severe, and assigned a Global Assessment of

Functioning (GAF) score of 40.[2]  Dr. Goldman noted that he would try get plaintiff

in for cognitive behavioral therapy with a therapist as soon as possible.  Dr.

Goldman increased plaintiff's dosage of Citalopram.  (Tr. 434-36)

On September 23, 2011, plaintiff underwent a psychosocial assessment by

the Missouri Department of Mental Health for symptoms of depression.  Plaintiff

reported to Ted Oliver, MSW/LCSW/CASAC, that he had increased difficulty

---

[2] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  *Diagnostic and Statistical Manual of Mental Disorders*, *Text Revision 34* (4th ed. 2000).  A GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work).

with depression since his son was murdered in 2004 and with the person who had killed his son having recently been released from prison. Plaintiff reported having difficulty sleeping, poor appetite, poor concentration, passive suicidal ideations, low motivation, social isolation, and anxiety. It was noted that plaintiff had been taking Celexa for about one year. Plaintiff reported having back and rib pain due to a work-related injury and that he is no longer able to stand because of his pain. Plaintiff reported having some difficulty with activities of daily living because of his back pain. Plaintiff expressed frustration at not being able to contribute financially to the family and that his relationships were strained because of his physical and mental health. Plaintiff also reported, however, that he had close relationships with his children and girlfriend and that he enjoyed spending time with his children. Mental status examination showed plaintiff's general appearance to be normal. Mr. Oliver noted plaintiff's motor activity to be mildly decreased because of chronic pain. Plaintiff was moderately withdrawn and was noted to have a flat affect and a moderately depressed mood. Plaintiff's flow of thought was normal. With content of thought, plaintiff was noted to have suicidal thoughts and assaultive ideas. Sensorium examination was normal. Plaintiff was noted to have normal intellect, but poor insight and judgment. Mr. Oliver diagnosed plaintiff with major depression, recurrent, severe, and assigned a GAF score of 40. Mr. Oliver recommended that plaintiff participate in the Community

Psychiatric Rehabilitation Program given his significant symptoms of major depression affecting his daily functioning in a significant way. (Tr. 437-40, 441-42)

On October 7, 2011, Teresa Moffitt, MS/CSS, from Mark Twain Behavioral Health visited plaintiff at his home for Community Support Services. Plaintiff reported taking a lot of pain medications and that he struggles with medication side effects and with depression. Plaintiff reported having financial difficulties and that his girlfriend works sixteen hours a day to support him and pay the bills. Ms. Moffitt noted that they would meet the following week to begin working on some goals. (Tr. 447)

Plaintiff returned to Dr. Goldman on October 12, 2011, who noted plaintiff to have had a fair response to his medication. Plaintiff reported having no side effects. Plaintiff also reported having fair to good sleep patterns with an adjustment to his Amitriptyline. Mental status examination showed plaintiff to have decreased activity and constricted affect, but was otherwise normal. Plaintiff displayed no suicide risk, psychosis, or aggression and demonstrated no risk to others. Dr. Goldman continued in his diagnosis of major depressive disorder and prescribed Wellbutrin. Plaintiff was instructed to taper his use of Citalopram. (Tr. 433)

On October 14, 2011, a plan was established with the Missouri Department

of Mental Health to provide assistance to plaintiff to cope with his pain and depression. Plaintiff's treatment team was noted to include Ms. Moffitt, Dr. Goldman, and Cindy Ehrhardt MA/LCSW. Plaintiff's diagnosis was noted to be major depression, recurrent, severe, without psychotic features; and his current GAF score was 40. (Tr. 443-46)

## V. The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through December 31, 2012. The ALJ found plaintiff not to have engaged in substantial gainful activity since April 1, 2007, the alleged onset date of disability. The ALJ found plaintiff's degenerative disc disease, old acromioclavicular separation of the right shoulder, history of open reduction/ internal fixation of the right ankle from a fracture in 1999, muscular strains, hypertension, and depression to be severe impairments, but that such impairments, either singly or in combination, did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16-18) The ALJ found plaintiff to have the RFC to perform light work, except that he can "perform no overhead reaching with his dominant right arm, and only occasional balancing, kneeling, stooping, crouching, crawling, and no climbing of ladders, ropes, scaffolds. He requires an allowance to change position for 1 to 2 minutes every hour. Mentally, he is limited to performing simple, routine tasks." (Tr. 16-17)

The ALJ determined that plaintiff was unable to perform any past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that vocational expert testimony supported a finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, usher/ticket taker, hand presser, and assembler. The ALJ thus found plaintiff not to be under a disability from April 1, 2007, through the date of the decision. (Tr. 17-26)

## VI. Discussion

To be eligible for DIB and SSI under the Social Security Act, a plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920 (2012); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir.

2002). Substantial evidence is less than a preponderance, but enough that a

reasonable person would find it adequate to support the conclusion. *Johnson v.*

*Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the

Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)

(internal quotation marks and citation omitted). "Substantial evidence on the

record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation

marks and citations omitted).

To determine whether the Commissioner's decision is supported by

substantial evidence on the record as a whole, the Court must review the entire

administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir.

1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

A.    New Evidence

Plaintiff claims that the ALJ found his mental impairment not to be severe and argues that consideration of new evidence from Dr. Goldman warrants a change in this finding. (Pltf.'s Brief, Doc. #13 at p. 7.) As noted *supra*, however, the ALJ did find plaintiff's depression to be a severe impairment (Tr. 16), although he determined it not to be of listing level severity (Tr. 17-18). Nevertheless, plaintiff contends that the new evidence submitted to the Appeals Council demonstrates plaintiff's mental impairment to be more severe than as determined by the ALJ and thus to cause more significant limitations in his mental ability to

perform work. Because a review of the entirety of the record, including the new evidence submitted to the Appeals Council, shows the ALJ's determination to be supported by substantial evidence, plaintiff's argument fails.

The ALJ summarized the evidence of record relating to plaintiff's mental impairment. The ALJ noted that plaintiff sought counseling in 2010 in relation to the murder of his son, which the record shows occurred in 2004; and that at the time of such counseling, plaintiff's distress appeared to be situational with the recent release of the perpetrator from prison. The ALJ also noted that while plaintiff made significant complaints to Ms. Hultgren in November 2010, including suicidal thoughts, isolation, and low self-esteem, he reported immediate improvement upon being prescribed Celexa. Impairments that are controllable or amenable to treatment do not support a finding of disability. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). The ALJ noted that plaintiff's complaints thereafter primarily involved physical complaints. *Cf. Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011) (ALJ did not err in finding claimant's mental impairment not to be severe where evidence showed, *inter alia*, that claimed limitations were caused by physical impairment).

The ALJ also discussed the Mental MSS completed by Ms. Hultgren in June 2011 and determined to accord little weight to the extreme limitations opined therein. (Tr. 23) This determination is supported by substantial evidence on the

record as a whole. As an initial matter, as noted by the ALJ, Ms. Hultgren is not an acceptable medical source under the Regulations and is thus unable to render a *medical* opinion. 20 C.F.R. §§ 404.1513(a), 416.913(a). The ALJ also determined to discount the opinion, because the record showed plaintiff's symptoms to be related to a situational matter and not to have affected his ability to work in the past. *See Gates v. Astrue,* 627 F.3d 1080, 1082 (8th Cir. 2010). The ALJ also noted the record as a whole to show that plaintiff did not experience the extreme limitations Ms. Hultgren recorded in the checklist MSS form, as demonstrated by plaintiff's demeanor and ability to answer questions at the administrative hearing, the little treatment plaintiff received for his mental impairment, and the lack of clinical signs demonstrating such opined limitations. *See Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (limited evidentiary value given to vague and conclusory checklist assessments); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (where limitations set out in a treating physician's assessment "stand alone" and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning," ALJ's decision to discount treating physician's statement is not error). Finally, the ALJ noted that Ms. Hultgren was not qualified to render an opinion as to the extent plaintiff's pain affected his ability to perform work. *See Brosnahan v. Barnhart*, 336 F.3d 671,

676 (8th Cir. 2003) (no error in discounting opinion of psychologist where it is based partly on consideration of physical impairments).

In determining plaintiff's mental ability to perform work-related activities, the ALJ found that, to the extent plaintiff experienced difficulties with activities of daily living, such difficulties were caused by his pain and not by any mental impairment. This finding is supported by substantial evidence on the record as a whole. *Cf. Buckner,* 646 F.3d at 557. The ALJ also found plaintiff's claimed irritability to likewise be caused by pain and that the evidence showed him able to get along with others, including his girlfriend, children, and treating and examining sources, and that little or no documented problems with irritability were noted by any provider. (Tr. 18) Finally, the ALJ found plaintiff to have moderate limitations in concentration, but none that would limit plaintiff's ability to perform simple routine tasks. This finding is supported by substantial evidence, including Dr. Goldman's mental status examinations that showed plaintiff's memory to be intact and his ability to focus to be affected only by activities that aggravate his pain.

Plaintiff argues, however, that the ALJ would have rendered a different decision if he had been able to consider evidence of Dr. Goldman's assigned GAF score of 40, which, plaintiff contends, shows that he had marked limitations in activities of daily living, social functioning, and concentration, persistence, and

pace.  Plaintiff's argument is misplaced.

GAF scores are insufficient in themselves to establish disability or non-disability.  The GAF scale has not been endorsed for "use in the Social Security and SSI disability programs" and "does not have a direct correlation to the severity requirements in [the] mental disorders listings."  65 FR 50746–01, 50764, 2000 WL 1173632 (Soc. Sec. Admin. Aug. 21, 2000); *see also Halverson v. Astrue,* 600 F.3d 922, 930-31 (8th Cir.2010).  As such, an ALJ is not bound by GAF scores assigned by a claimant's provider in determining the effects of the claimant's mental impairment; instead, the ALJ must review the record as a whole. *Halverson,* 600 F.3d at 931.

Here, when considered with the other evidence on the record, the evidence obtained from Dr. Goldman, including the assigned GAF score, does not cause the ALJ's decision to no longer be supported by substantial evidence.  Indeed, the evidence obtained from Dr. Goldman is consistent with the ALJ's findings relating to the other evidence of record.  Examinations by Dr. Goldman showed plaintiff's mental condition to be related to a situational matter and to improve with medication.  While plaintiff's mental status examinations showed depressed mood and constricted affect, they also showed intact memory, full orientation, and otherwise generally normal results.  Contrary to plaintiff's assertion, this new evidence does not confirm Ms. Hultgren's June 2011 opinion that plaintiff

experienced extreme limitations in dealing with other people, such as supervisors, coworkers, and the general public. A review of all of the treatment notes shows that any concern regarding plaintiff's ability to get along with others appeared to be limited to the person who killed his son. Other than this situational concern, the record does not show an inability to get along with others. In addition, nothing in the new evidence provides support for Ms. Hultgren's opinion that plaintiff experiences extreme limitations in carrying out simple instructions. Indeed, during his appointments with Dr. Goldman, plaintiff demonstrated an intact memory and reported no difficulty with focus except when he engaged in pain-inducing activities. While a GAF score of 40 indicates serious symptoms, such a score need not be relied upon when it appears to be extreme in light of other substantial evidence. *Juszczyk v. Astrue*, 542 F.3d 626, 632-33 (8th Cir. 2008); *see also Hudson ex rel. Jones v. Barnhart,* 345 F.3d 661, 666-67 (8th Cir. 2003) (ALJ does not err in according less weight to opinions giving rise to low GAF scores where evidence shows scores not to reflect claimant's actual abilities).

Accordingly, when considered with the other evidence of record, the new evidence submitted to the Appeals Council does not render the ALJ's decision as to plaintiff's mental ability to perform work-related activities unsupported by substantial evidence on the record as a whole. Because the ALJ's decision that plaintiff retained the ability to perform simple, routine tasks – with no other mental

limitations – lies within the available zone of choice, it must be affirmed even if another, inconsistent position may also be drawn from the evidence. *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008); *see also Moad v. Massanari*, 260 F.3d 887, 891 (8th Cir. 2001) (although not all the medical evidence "pointed in that direction," there nevertheless was a sufficient amount that did).

B.    Credibility Determination

Plaintiff claims that the ALJ erred when he found his subjective complaints not to be credible, arguing specifically that the ALJ relied only on the lack of objective medical evidence to discredit plaintiff's complaints. For the following reasons, plaintiff's argument is without merit.

An ALJ may not disregard a claimant's subjective complaints solely because they are not fully supported by objective medical evidence. *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995)). Instead, in addition to considering objective medical evidence, the ALJ must consider all evidence relating to the claimant's complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions, *i.e.,* the *Polaski* factors. *Halverson,* 600 F.3d at 931; *Ramirez*, 292 F.3d at 581; *Polaski v. Heckler*, 739 F.2d 1320,

1322 (8th Cir. 1984) (subsequent history omitted).  While an ALJ need not

explicitly discuss each *Polaski* factor in his decision, he nevertheless must

acknowledge and consider these factors before discounting a claimant's subjective

complaints.  *Wildman,* 596 F.3d at 968.

When, on judicial review, a plaintiff contends that the ALJ failed to properly

consider his subjective complaints, "the duty of the court is to ascertain whether

the ALJ considered all of the evidence relevant to the plaintiff's complaints . . .

under the *Polaski* standards and whether the evidence so contradicts the plaintiff's

subjective complaints that the ALJ could discount his or her testimony as not

credible."  *Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004).  It is not

enough that the record merely contain inconsistencies.  Instead, the ALJ must

specifically demonstrate in his decision that he considered all of the evidence.  *Id.*

at 738; *see also Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991).   Where an

ALJ explicitly considers the *Polaski* factors, but then discredits a claimant's

complaints for good reason, the decision should be upheld.  *Hogan v. Apfel*, 239

F.3d at 962.  The determination of a claimant's credibility is for the Commissioner,

and not the Court, to make.  *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005);

*Pearsall*, 274 F.3d at 1218.

Here, contrary to plaintiff's assertion, the ALJ set out numerous

inconsistencies other than the lack of objective medical evidence to find plaintiff's

subjective complaints not to be entirely credible.  First, the ALJ noted that subsequent to plaintiff's injury in December 2005, plaintiff's physician opined that plaintiff engaged in symptom magnification and noted that another of plaintiff's physicians shared the same opinion.  *E.g., Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (physicians' statements of symptom exaggeration, coupled with tests that were inconsistent with complaints of pain, supported ALJ's adverse credibility determination).  The ALJ also noted plaintiff's strong work history, but noted that his last job ended for reasons other than an inability to do the job on account of medically determinable impairments.  *E.g., Johnson v. Astrue*, 628 F.3d 991, 995-96 (8th Cir. 2011) (complaints of disabling pain discredited by evidence that claimant never quit a job on account of her impairments).  The ALJ also noted medication to help plaintiff's mental impairment, and that plaintiff did not seek treatment for any mental impairment until over three years after his alleged onset of disability.  *E.g.*, *Roth,* 45 F.3d at 282; *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (failure to seek relevant medical treatment inconsistent with complaints of persistent and disabling symptoms).  Indeed, to the extent plaintiff claims that he suffered depression on account of his son's death in 2004, the record shows plaintiff to have successfully worked with such impairment for a period of years and not to have sought treatment for the condition until 2010.  *E.g.*, *Goff v. Barnhart*, 421 F.3d 785, 792-93 (8th Cir. 2005) (fact that claimant worked with

impairment relevant to credibility determination).  While the record shows an exacerbation of the condition in 2010 precipitated by the release of the perpetrator, *see id.* (deterioration of condition must be considered), such exacerbation appeared to be controlled with medication.  *Roth,* 45 F.3d at 282.  The ALJ also noted that despite plaintiff's reports of limited daily activities, no physician ever indicated that any medical reason limited plaintiff's activities to the extent he alleged.  *See Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) (lack of functional restrictions imposed by physician inconsistent with alleged disabling pain).  Finally, the ALJ considered plaintiff's relatively strong pain medications, but noted that plaintiff never saw a specialist nor underwent additional physical therapy or additional diagnostic testing for his complaints of disabling pain.  To the extent plaintiff criticizes this finding given his demonstrated inability to afford such testing and/or treatment, the record shows that the ALJ adequately addressed plaintiff's financial constraints and gave him "every benefit of the doubt" regarding his pain.  (Tr. 21-22, 24-25)

A review of the ALJ's decision shows that, in a manner consistent with and as required by *Polaski*, the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from his credibility.  (Tr. 18-25)  Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial

evidence, this Court must defer to the ALJ's credibility determination. *Goff,* 421

F.3d at 793; *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).


C.     Medication Side Effects

Plaintiff claims that the ALJ failed to consider the side effects of his narcotic

pain medications and failed to appreciate the significance of plaintiff losing his job

on account of a false positive drug test caused by his medications.  The

undersigned addresses each of these claims in turn.

To the extent plaintiff argues that the ALJ failed to generally address the

side effects of his pain medications – including sleepiness, drowsiness, dizziness,

difficulty focusing, and difficulty concentrating – the record shows plaintiff not to

have reported to any provider that he experienced any such side effects with his

narcotic medications.[3]  Nor did any provider observe these effects during their

examinations.  While plaintiff reported to Dr. Wells in May 2011 that he slept for

two days with a recent prescription of Amitriptyline, an anti-depressant, plaintiff

made no other report of sleepiness regarding this or any other medication

thereafter.  Indeed, at this May 2011 appointment, Dr. Wells instructed plaintiff to

take this medication only as needed, and plaintiff made no further reports of

---

[3] Although plaintiff reported to Ms. Moffitt in October 2011 that he experienced medication side effects, he did not describe what they were or how they affected him.

sleepiness. Because there is no evidence in the record demonstrating that medication side effects actually affected plaintiff's ability to perform work-related activities, the ALJ did not err by omitting potential side effects of medications from his RFC finding. *Owen*, 551 F.3d at 801-02.

With respect to the false positive drug test that precipitated plaintiff losing his job, the ALJ addressed the circumstance as follows:

> [T]he claimant reported he was terminated from his job in July [sic] 2007, his alleged date of onset, not because of his impairments but because he tested positive for cocaine, apparently a false positive. He indicated Dr. Baumann gave him a note that said positive test was because he was taking Vicodin and hydrocodone, but his termination held. Although it is unfortunate that the claimant lost his job for this reason, nonetheless what is important here is that he lost his last job for reasons other than his medically determinable impairments and not due to an inability to do his last job.
>
> . . .
>
> The undersigned has considered the claimant's good work history performing heavy work. However, he testified his last job ended because he tested positive on a drug test, but it was due to prescription pain meds, not street drugs. The undersigned finds this credible and an earlier report by the claimant to an examining physician corroborates this. Still, the job ended for non-medical reasons, not due to an inability to perform it.

(Tr. 20, 24) Plaintiff contends that the ALJ's statement that the job "ended for non-medical reasons" is erroneous given that plaintiff lost his job because of the effects of pain medication that he was taking for medical reasons. This is a distinction without a difference. The plaintiff's unfortunate termination was the

- 40 -

result of a drug test that gave a false positive for the presence of an illicit substance in the plaintiff's system, not because of a physical or mental limitation caused by a medical condition.

As noted by the ALJ, no evidence appears in the record that, at the time plaintiff's job ended, he was physically and/or mentally unable to perform the work required. While the job ended on account of the false positive drug test caused by medication, the outcome of the ALJ's analysis is nevertheless the same: there was no demonstrated inability of plaintiff to perform the work on account of the physical or mental effects of a medically determinable impairment. A review of the ALJ's discussion *in toto* shows him to have understood and appreciated the circumstance giving rise to plaintiff's termination and to have properly considered it in his overall analysis. An arguable deficiency in opinion-writing technique does not require an ALJ's finding to be set aside when the deficiency has no bearing on the outcome. *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008).

## VII. Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled from April 1, 2007, through the date of the decision is supported by substantial evidence on the record as a whole, and plaintiff's claims of error should be denied. Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not

reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001); *see also Buckner,* 646 F.3d at 556.

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of August, 2014.